MARTHA E. ROBISON, JEANNETTE M. CAMPBELL, ROBERT FICKLE, SHELLY D. ZIMMERMAN, THERESE C. LO COCO, DON D. BEBEE, SR., FRIEDA JANE MILLER, JEAN BYRKETT AND VERA PRICE *v.* FRANK C. FICKLE, AS EXECUTOR OF THE LAST WILL AND TESTAMENT OF LUCY L. WILSON, DECEASED, AND FRANK C. FICKLE, NINA NELL MILLER, FRED C. FICKLE, ROBERT JOSEPH MILLER AND CYNTHIA SUE MILLER.

[No. 2-1273A278. Filed January 26, 1976. Rehearing denied February 23, 1976. Transfer denied August 20, 1976.]

652

*Robert S. Justice,* of Logansport, for appellants.

*Noel, Noel & Williams,* of Kokomo, for appellee Frank C. Fickle, *O'Mahoney, Mahoney, Simmons & Fleming,* of Kokomo, for appellees Miller, *Davis & Davis,* of St. Louis, Missouri, for Trustee in Bankruptcy for appellee Robert Miller.

SULLIVAN, J.—This issues upon appeal concern conflicting ownership claims to certain intangible personal property held by decedent Lucy L. Wilson (Lucy) jointly with her niece Cynthia, and nephew Robert, respectively. The residuary legatees (hereinafter collectively, Robison) under decedent's will make claim to the property and the surviving joint tenants assert ownership of the property bearing their respective names. The property consists of 3896 shares of Common Capital Stock of the General Motors Corporation, certificates of deposit issue by Union Bank and Trust Co. of Kokomo totalling $40,000.00 and a savings account in First Federal Savings and Loan Assn. of Kokomo totalling $118.75.

The Executor of Lucy's estate filed a declaratory judgment action seeking to resolve the conflicting ownership claims. The court entered summary judgment in favor of Cynthia and Robert, thereby upholding their respective claims as surviving joint tenants, and accompanied it with a comprehensive and scholarly opinion.

The issue which is dispositive may be broadly stated as follows:

(1) Whether there was a genuine issue as to a material fact so as to preclude the proper entry of a summary judgment.

In creating the broad issue, we are obliged to address ourselves to the component issues of law which the court below sought to resolve by its summary judgment, i.e., the nature of the interest held by Cynthia and Robert in the intangible personalty at the time of their Aunt Lucy's death, and various factors alleged by the residuary legatees to present a genuine issue as to the fact of Lucy's intent with respect to the property involved.

A recitation of the facts surrounding creation of the joint interests in the intangibles is necessary to place the material issues in perspective.

Lucy, a resident of Kokomo, died testate on January 14, 1972. Prior thereto, on August 5, 1971, Lucy instructed Union Bank & Trust Co. to reissue[1] certain certificates of deposit, originally issued in her sole name, to decedent or Cynthia ($20,000) and to decedent or Robert ($20,000). The certificates bore the following words: "as joint tenants with right of survivorship and not as tenants in common." Decedent retained sole possession of the certificates. Robert and Cynthia were unaware of the transaction until after Lucy's death.

On January 7, 1970 and October 10, 1971, Lucy created three joint savings accounts with Cynthia at First Federal Savings and Loan Association of Kokomo. Cynthia executed the signature cards, as did Lucy. The signature cards bore the following language:

"It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or

---

1. It appears that the bank did not issue new certificates in joint names but added Robert's and Cynthia's respective names to the already existing certificates. See Part V, infra.

added to the account by one of the parties, are and shall be conclusively intended to be a gift and delivery at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account."

Cynthia made no deposits or withdrawals. On the date of decedent's death, two of the accounts were exhausted. The remaining account had a balance of $118.75.

On December 3, 1971, at Lucy's direction, 3896 shares of General Motors common stock previously held in Lucy's sole name were reissued in the names of Lucy and Robert (2000 shares), and Lucy and Cynthia (1896 shares). Following the names on the face of the stock certificates was the abbreviation "JT TEN", defined by printing upon the certificate as "joint tenants with right of survivorship and not as tenants in common". Lucy retained sole physical possession of the stock certificates. Robert and Cynthia were unaware of the transfer until following Lucy's death.

Lucy executed her last will on December 21, 1971. The provisions of the will disposed of her estate in a manner not inconsistent with her prior actions.

Upon appeal, the residuary legatees (Robison) assert that a material issue of fact existed. The question as presented is whether the court correctly found, as a matter of law, that Lucy had the requisite donative intent. More specifically, Robison asserts the following acts or statements as indicative of a non-donative intent and that certain other factors serve to defeat the claimed interests of Cynthia and Robert:

(1) Cynthia and Robert had no knowledge of the creation of joint tenancies in the certificates of deposit or in the General Motors stock until after Lucy's death.

(2) Lucy retained sole control of the property during her lifetime, keeping them in her safety deposit box.

(3) Lucy collected the income from such property during her lifetime.

(4) The provisions of the "Uniform Stock Transfer Act" with respect to delivery were not met in Lucy's attempt to create a joint tenancy in General Motors' stock.

(5) The four unities of time, title, interest and possession requisite to valid creation of a joint tenancy are not all present, particularly as to the certificates of deposit since the names of Cynthia and Robert were merely added to already existing certificates.

(6) Lucy stated in creating the joint tenancies in the certificates of deposit that "she wished [them] issued in such a way that upon her death they would be payable to her niece and nephew. . . ." The residuary legatees contend that such was an invalid substitute for a testamentary disposition.

## I

### PAROL EVIDENCE IMPLICATIONS OF *IN RE ESTATE OF FANNING* NOT APPLICABLE WHEN DONATIVE INTENT IS FIXED BY CLEAR WORDS, INTENTIONALLY USED, AND NOT SUBJECT TO MORE THAN ONE REASONABLE INTERPRETATION

At the outset, it is necessary to state in the light of the law as presently extant, that the dispositive issue as posed by the parties is not completely adequate for resolution of this cause.

Following the briefing and oral argument of this appeal, the Indiana Supreme Court in *Seavey* v. *Fanning* (*In re Estate of Fanning*) (1975), 263 Ind. 414, 333 N.E.2d 80 adopted the earlier opinion of the Court of Appeals which held that bank certificates of deposit issued in joint names "payable to either of them with the right of survivorship and not as tenants in common" created a third party beneficiary contract. The court specifically rejected the delivery requirement essential to the "gift" theory of *Zehr* v. *Daykin* (1972), 153 Ind. App. 537, 288 N.E.2d 174, as a basis for determining the validity of the claim of a surviving joint owner. In so doing, however, the Court stated:

"The intent of the donor-creditor is of paramount importance in a third party beneficiary contract. *Voelkel* v. *Tohulka* (1957), 236 Ind. 588, 141 N.E.2d 344. This unique contractual device, which has experienced considerable difficulty fitting into the common law theoretical molds, may serve several intentions. One intent may be to avoid any

probation of the donor-creditor's estate. A second intent for the device might be for only temporary use during illness or absence from the State. A third intent may be to use the device as a security.

Without an expression to the contrary, the third party donee-beneficiary contract creates a rebuttable presumption that the usual rights incident to jointly owned property with the right of survivorship was intended. *Miles* v. *Hanten* (1969), 83 S.D. 635, 164 N.W.2d 601. *Also see* IC 1971, 28-1-20-1, *supra*, and IC 1971, 28-4-4-2 (Burns Code Ed.). The burden of proof is upon the party who wishes to show a contrary intent from that expressed in the third party beneficiary contract." 333 N.E.2d at 84-85.

The contract theory adopted in *Fanning, supra,* effectively eliminates the requirement of a delivery required under the gift theory. It is not an over-simplification to say, however, that "the transaction is, in reality, a gift and that the contract is the substitute for delivery." Kepner, *The Joint & Survivorship Bank Account,* 41 Cal. L. Rev. 596, 604. *Fanning,* does not, therefore obviate the necessity that the donor's intent be established. That donative intent is presumptively established by the use of words disclosing a joint tenancy relationship as opposed to a tenancy in common. This is not to say that a contestant may not, in some instances, offer evidence of the circumstances surrounding the creation of the joint tenancy in an attempt to rebut the presumption of intent. Yet, where the words of the contract are clear and unambiguous, it would seem otherwise. Thus parol evidence concerning donative intent as arguably contemplated by *Fanning,* should be admitted only when the terms of the contract permit a reasonable construction which negatives the donative intent and the intent to create a right of survivorship in the entirety of the property. *See Myers* v. *Maris* (1975), 164 Ind. App. 34, 326 N.E.2d 577, 581; *Fort Wayne Bank Building, Inc.* v. *Bank Building & Equipment Corp. of America.* (1974), 160 Ind. App. 26, 309 N.E.2d 464, 467.

The intent of the parties to a contract is always vital to

an understanding of that contract and of the relationships and rights created. However, as stated in *City of Indianapolis* v. *Kingsbury* (1884), 101 Ind. 200, 213:

> ". . . the intention to which Courts give heed is not an intention hidden in the mind of the landowner, but an intention manifested by his acts. It is the intention which finds expression in conduct and not that which is secreted in the heart of the owner, that the law regards. Acts indicate the intention, and upon the intention clearly expressed by open acts and visible conduct the public and individual citizens may act."

Thus does the law hold one to the natural legal consequences of words consciously chosen and utilized in a contract. 4 Williston on Contracts (3d ed.) § 606.

The true thrust of the arguments of Robison is not that Lucy did not intend to enter into contracts nor that she did not intend to use the particular words appearing upon the various contract instruments, but rather than Lucy did not intend the usual and natural legal consequences to flow from her volitional conduct.

It is not enough to say that, although Lucy did in fact intend to use words which create in law a particular relationship and with certain legal consequences, she did not intend the consequences which so flowed. This elemental principle was early stated in *Heavenridge* v. *Mondy* (1875), 49 Ind. 434, 439:

> "A mistake as to the legal effect of words inserted designedly in a written instrument gives no right to a reformation of such instrument."

Whatever may have been the motive or purpose of Lucy in using words of joint tenancy with right of survivorship, she did in fact use those very words. There is no hint of record that she did so unintentionally or that she was defrauded or coerced. The purpose and motive behind the use of such words must therefore be distinguished from the intent to use them. *See Eby* v. *State* (1972), 154 Ind. App. 509, 290 N.E.2d 89.

Phrased somewhat more appropriately in terms of contracts and parol evidence, Professor Wigmore draws the distinction as follows:

"When we seek to ascertain the standard and the sources of interpretation, thereby to discover the actor's association of words with external objects, what is the term, in one word, which describes the object of the search? Is it the person's 'meaning'? Or is it his 'intention'?

Over this difference of phraseology has persisted an endless controversy, which, like that of the two knights and the shields at the crossroads, is after all resolvable mainly into a difference of epithets only.

The distinction between 'intention' and 'meaning' is vital. The distinction is independent of any question over the relative propriety of these names; for there exist two things, which must be kept apart yet never can be, unless different terms are used. The words 'will' and 'sense' will here be adopted, as sufficiently indicative of these two things and free from the ambiguity of the other terms.

Will and Sense, then are distinct. Interpretation as a juristic process is concerned with the Sense of the word used, and not with the Will to use that particular word. The contrast is between that Will, or volition to utter, which, as the initiative element of an act, makes a person responsible for a particular utterance of his, and that Sense or meaning which involves the fixed association between the uttered word and some external object. It has already been seen (ante, § 2413) that, by the general canon of jural acts, the person's actual will or intent to utter a given word can seldom be considered for juristic purposes. If he has exercised a volition to utter something, then he is responsible for such utterance as is in external appearance the utterance he intended,—whether or not he actually intended it. On the other hand, the sense of his word as thus uttered—his fixed association between that symbol and some external object—may usually be given full effect, if it can be ascertained. The rules for the two things may be different." 9 Wigmore on Evidence § 2459, p. 183 (3d Ed. 1940).

Having thus delineated the "object of the search", Wigmore enunciates the clear rules prohibiting extrinsic utterances as "expressions of intention" (9 Wigmore, Evidence § 2471, p. 229) and deviations from words "when the meaning is

'plain'—that is, plain by the standard of the community and of the ordinary reader". (9 Wigmore § 2461, p. 190):

Professor Wigmore, however, does recognize permissible use of a local or trade standard and even an individual standard in giving meaning to words:

"The search is for the sense of a word or phrase as used, and the object is therefore to find the standard actually employed by the party. Now, as a member of the community, he presumably uses words in the normal sense of the community; this standard will therefore be "prima facie' accepted. But if it appears that, as a resident of a special village, he used the sense of that village, then this local standard may be substituted for the other. Still further, if it appears that the parties to a specific contract have a special mutual sense, or that a testator has a special individual sense, the mutual or the individual standard may replace the normal or the local standard." 9 Wigmore § 2460, p. 186 (3d Ed. 1940).

Here, there is only the implied contention that Lucy placed a meaning upon the words appearing in the contractual instruments different than that required by application of common or community standards of interpretation. Robison points to no fact or act indicating that some special or unque or local meaning was intended. To the contrary, if there is a special usage of the words, such usage in the commercial world is identical with that in the law. In short, the words "joint tenants with right of survivorship and not as tenants in common," mean simply, insofar as here pertinent, that upon the death of one joint tenant, the survivor owns the whole.

Accordingly, we find no basis in law for application here of any parol evidence exception implied by the *Fanning* decision, *supra*.

Be that as it may, the facts and circumstances which are here claimed by Robison to defeat the requisite donative intent were not before the trial court burdened by a parol evidence objection.

Without regard to strict parol evidence considerations, therefore, we turn to the specific assertions made by Robison and a determination as to whether any one or more of them will serve to defect an otherwise validly created joint tenancy.

## II

## EVIDENCE AS TO CONTRACTUAL INTENT LIMITED TO SURROUNDING CIRCUMSTANCES AT TIME OF CONTRACT

Even were we to so broadly construe the "donative intent" language of the *Fanning* decision as to contemplate proof of acts, statements and circumstances surrounding creation of the contracts here considered, such construction would not permit evidence at variance with the "presumed intent" if such consists of acts or statements *after* creation of the contract.

The intention of the parties is to be determined "in the light of surrounding circumstances *which existed at the time*" the contract was made. *Standard Land Corporation of Indiana* v. *Bogardus* (1972), 154 Ind. App. 283, 289 N.E.2d 803 at 823 (emphasis supplied).

In *Hyland* v. *Standiford* (1961), 253 Iowa 294, 111 N.W.2d 260, a case deemed particularly appropriate to our consideration, the Iowa Supreme Court viewed stock certificates issued to a husband and wife as joint tenants with right of survivorship as conclusive against the husband's later attempt at testamentary disposition. The court there did not disregard the husband's inter vivos intent. To the contrary, notwithstanding subsequent acts of the husband which arguably reflected adversely upon an original "intent" to create survivorship rights, the creation of the joint tenancy as established by the particular words used, was held controlling:

"Together with the trial court, we regret the uncertainties that frequently arise when property is held in joint tenancy. We are aware of the disappointment that follows when a benefaction fails because not subject to testamentary dis-

position. However, we cannot ignore plain and positive words and actions establishing property rights. A change in conditions does not act retrospectively in establishing an original intent."

\* \* \*

"In 1957, \* \* \* Mr. Standiford, for the first time, did something that might conflict with the survivorship rights of his wife. By will, he attempted to control the ultimate testamentary disposition of the property. His efforts were 'too little and too late.' "

\* \* \*

"While there are several procedures for the severance or dissolution of a joint tenancy, an attempted disposition by will is not one of them. A will speaks only from the death of the testator. The death of a joint tenant terminates his interest and leaves no part of the joint tenancy property subject to his will." 253 Iowa at 298, 299 and 303, 111 N.W.2d at 263, 264 and 266.

Accordingly, only such acts or statements by Lucy prior to or contemporaneous with her creation of the contracts here could be considered as indicative of her "donative intent". This premise effectively eliminates Lucy's collection of dividend or interest income as a fact which would defeat the survivorship interests of Cynthia and Robert. The same may be said of Lucy's placing of the intangibles in her safety deposit box and of her failure to advise Cynthia and Robert of the creation of the joint tenancies. *Hayes* v. *Lewis* (1975), Ill. App., 338 N.E.2d 102.

To the extent, however, that Lucy's retention of control, failure to advise Cynthia and Robert of the joint tenancy, and her right of income from the property be deemed acts contemporaneous with creation of the contracts, we address those arguments.

### III

### (A) RETENTION OF CONTROL BY DONOR AND LACK OF KNOWLEDGE BY DONEE WILL NOT DEFEAT JOINT TENANCY

Retention of control is a factor which may defeat a gift *delivery* requirement. *Zehr* v. *Daykin, supra; Cunningham* v.

*Teague* (1939), 105 Ind. App. 46, 11 N.E.2d 525. But with the advent of the *Fanning decision,* it is no longer a factor separate and apart from delivery. *See also Wilt* v. *Brokow* (1952 7th Cir.) 196 F.2d 69. *Compare Ogle* v. *Barker* (1946), 224 Ind. 489, 68 N.E.2d 550. Thus, as in *Fanning, supra,* the fact that Lucy retained sole control of the property during her lifetime and the fact that Robert and Cynthia did not know of the existence of the certificates of deposit or of the common stock in their respective names has no adverse effect upon Robert's and Cynthia's survivorship rights.

### (B) DONOR'S RETENTION OF DIVIDEND AND INTEREST INCOME DOES NOT DEFEAT SURVIVORSHIP RIGHTS OF JOINT TENANT

The affidavit of Don B. Bebee, Sr., (one of the residuary legatees) in opposition to Cynthia and Robert's Motion for Summary Judgment, states that Lucy "collected all dividends and interest from the said property until her death." Such may be deemed a naked conclusion unsupported by "such facts as would be admissible in evidence" as required by TR. 56(E) and thus properly discounted by the court below.

Nevertheless, it has been held in many instances that income retention during the donor's lifetime will not defeat a survivor's interest in joint-tenancy property. *Hayes* v. *Lewis, supra; Bunt* v. *Fairbanks* (1967), 81 S. Dak. 255, 134 N.W.2d 1; *Allender* v. *Allender* (1952), 199 Md. Ct. App. 541, 87 A.2d 608. *See Daws* v. *Drusella Home* (1948), 118 Ind. App. 639, 79 N.E.2d 420; *Fuqua* v. *Merchants Loan & Savings Assn.* (1944), 114 Ind. App. 607, 54 N.E.2d 287. We so hold.

## IV

## INVESTMENT SECURITIES PROVISIONS OF UNIFORM COMMERCIAL CODE (UNIFORM STOCK TRANSFER ACT) DO NOT REQUIRE DELIVERY TO DONEE BENEFICIARY

Robison attempts to defeat the claims of Robert and Cynthia to the General Motors stock by claiming that the Investment Security provisions of the Uniform Commercial Code were not followed. Particularly Robison refers to Ind. Ann. Stat. § 26-1-8-309 (Burns Code Ed. 1974) which states that an indorsement does not constitute a transfer until delivery of the security and Ind. Ann. Stat. § 26-1-8-313 (Burns Code Ed. 1974) which states that delivery to a purchaser occurs when he or a person designated by him acquires possession.[2] Robison then alludes to the fact that physical delivery of the stock certificates was not made to Cynthia or Robert.

This argument loses sight of the obvious. A single stock certificate cannot normally be physically possessed at the same instant by two separate persons. The Indiana Comments to § 26-1-8-313 acknowledge the practicality of such situations and note that delivery to one joint tenant is constructive delivery to the other. When Lucy caused the General Motors stock to be issued in joint names with Robert and Cynthia respectively and when delivery of the new certificates was made to Lucy, the requirements of §§ 26-1-8-309 and 313 were met. *Hayes* v. *Lewis, supra; Bunt* v. *Fairbanks* (1965), 81 S. Dak. 255, 134 N.W.2d 1, *supra.*

---

2. We are not here concerned with the possible attempt of a donor-joint tenant to defeat the survivorship right of his co-joint tenant by sale and delivery of the stock to a third person without the indorsement of the co-joint tenant. *See* Ind. Ann. Stat. §§ 26-1-8-301, 26-1-8-307, 26-1-8-308, 26-1-8-311 and 26-1-8-315.

## V

## VALID JOINT TENANCY IN PERSONAL PROPERTY MAY BE CREATED WITHOUT UNITY OF TIME

Robison attacks the joint tenancies here involved, particularly that of the bank certificates of deposit, upon the ground that the traditional common law unities of time, title, interest and possession are lacking. Robison points to the fact that as to the bank certificates, Lucy merely had the names of her niece and nephew added to certificates already in existence and which bore Lucy's sole name. It is claimed that such defeats the unity of time in that the respective interests of Lucy on the one hand, and Cynthia and Robert on the other, were not created at the same time. This assertion might also be directed, in lesser degree to the stock certificates reissued in joint names but originally held in Lucy's sole name.

The statutory law of Indiana recognizes the right of survivorship in the entirety of a fund or asset held in joint names so long as the instrument expresses that right of survivorship. *Salvation Army Inc.* v. *Hart* (1958), 239 Ind. 1, 154 N.E.2d 487; *Hibbard* v. *Hibbard* (1947), 118 Ind. App. 292, 73 N.E.2d 181. Otherwise, the survivor has only such rights as a surviving tenant in common. Ind. Ann. Stat. § 32-4-1-1 (Burns Code Ed. 1973).[3] The statute does not incorporate the common law unities of time, title, interest and possession as a prerequisite for a valid joint tenancy with right of survivorship. Several states with similar statutes have abolished the four common law unities with respect to joint tenancy in real estate. *See Florida National Bank of Jacksonville* v. *Gann* (1958 Fla. App.), 101 So. 2d 579; *Switzer* v. *Pratt* (1946), 237 Iowa 788, 23 N.W.2d 837; *Haynes* v. *Barker* (1951 Ky. App.), 239 S.W.2d 996. Indiana

---

3. As between a husband and wife however, the mere use of the joint names, carries with it the right of survivorship "unless a clear contrary intention is expressed in a written instrument." IC 32-4-1-1(c), added by 1971, P.L. 422, § 1. *See Lester* v. *Lester* (1974), 160 Ind. App. 671, 313 N.E.2d 357.

has not specifically done so with reference to real estate. *See Hornung* v. *Biggs* (1967), 140 Ind. App. 349, 223 N.E.2d 359 (requiring four unities to exist in construing Ind. Ann. Stat. 32-1-2-7 which as to real estate is similar to IC 32-4-1-1, *supra*. However, subsequent to the *Hornung* decision (the last Indiana decision holding the four unities requisite as to real estate), Ind. Ann. Stat. 32-1-9-1 became effective. This statute permits a grantor to create directly by deed a joint tenancy with right of survivorship in himself and another. At very least therefore, the unity of time has been eliminated as a joint tenancy requisite insofar as such unity was deemed fulfilled only by a break in the chain of title. Be that as it may, and notwithstanding the possible requirement of the common law unities with respect to real estate joint tenancies, we consider them to be a vestige of the past with no requisite application to creation of joint tenancies with right of survivorship as to savings accounts, bank certificates of deposit or corporate common stock. *Hyland* v. *Standiford* (1961), 253 Iowa 294, 111 N.W.2d 260 at 264, *supra; Hines, Personal Property Joint Tenancies,* 54 Minn. L. Rev. 509 at 514.

We therefore hold the possible lack of the common law unity of time not crucial to the claims of Robert and Cynthia here.

## VI

## INTENT TO EFFECT TESTAMENTARY DISPOSITION WILL NOT DEFEAT OTHERWISE VALID CREATION OF JOINT TENANCY

Lucy stated concerning the deposit certificates that "she wished to have the certificates issued in such a way that upon her death they would be payable to her niece and nephew." Such is not incompatible with an existence of "intent" or "purpose" on her part to create *at that time* a present interest.

Although Lucy's statement might be superficially considered to be admissible if advanced by residuary legatees to show that the joint tenancy was "intended" as a substitute for a

testamentary disposition and thus contrary to an "intent" to create a present interest in the property, a similar state-ment[4] was held *as a matter of law* in *Fanning, supra,* to not permit a factual determination by the trier of fact that the donor-decedent did not intend to create a present interest in the donee-beneficiary.

We necessarily conclude, therefore, that even if one creates a third party beneficiary contract right in a joint tenancy in the expectation that the asset (to the extent that it remains at the donor's death) will pass directly to the surviving joint tenant without regard to the laws governing testamentary dispositions, such subjective purpose will not defeat the ownership claim of the surviving joint tenant. *Fanning, supra,* 315 N.E.2d at 723, footnote 7; *Estate of Harvey* v. *Huffer* (1955), 125 Ind. App. 478, 126 N.E.2d 784. As stated in *Blanchette* v. *Blanchette* (1972 Mass.), 287 N.E.2d 459, 463-464, relied upon in *Fanning, supra:*

> "We recognize that under the cases cited the arrangement of the parties provides a substitute for a will. But we see no harm in that. 'If an owner of property can find a means of disposing of it inter vivos that will render a will unnecessary for the accomplishment of his practical purposes, he has a right to employ it. The fact that the motive of a transfer is to obtain the practical advantages of a will without making one is immaterial.'"

> \* \* \*

> "Our law in this situation is in harmony with that in many other States. 'The formal requisites of wills serve two main purposes: to insure that dispositions are carefully and seriously made, and to provide reliable evidence of the dispositions. Those purposes are adequately served by the institutional setting and the signed writing normally involved in taking out insurance, opening a bank account, buying United States Savings Bonds, or entering a government pension system.'" *See also In re Mueth's Estate* (1962), 33 Ill. App.2d 449, 179 N.E.2d 695.

---

4. The decedent's statement in the *Fanning* case was that her intention was "to take care of [the donee-beneficiary]."

Those who see, in our holding today, a flagrant violation of the law of testamentary disposition, need only consider that the focal point of both the law of wills and the law of third party beneficiary contracts is the intent of the testator or donor. To honor the form of the one at the sacrifice of the other is to frustrate the decedent's true and ascertainable intent.

To be sure, as cautioned by the *Fanning* case, a decedent's purpose (as opposed to intent) in creating a third party beneficiary contract, may be to frustrate legitimate creditors. Such happenstance, however, may be readily cured by legislation subjecting decedent's contribution to jointly held assets to the just claim of creditors. See Final Draft, Probate Reform Act of 1975, Non Probate Transfers § 30-3-4-7 (not enacted into law). In any event, such possible frustration of creditors is not cause to hold that all inter vivos third party beneficiary contracts of the nature here involved are without legal recognition. As we have stated, vis-a-vis residuary legatees of a will or heirs of an intestate decedent, such surviving joint tenant should prevail.

## VII

### CATEGORIZATION OF ISSUE AS ONE OF LUCY'S STATE OF MIND DOES NOT PRECLUDE PROPER ENTRY OF SUMMARY JUDGMENT

Although the controversy here may be said to involve Lucy's "state of mind", that description of the issue does not place it within the oft times misapplied proscription of *Mayhew* v. *Deister* (1969), 144 App. 111, 224 N.E.2d 448 precluding summary judgment. (*Cf. First Federal Savings & Loan Assn. of Evansville* v. *Baugh* (1974), 160 Ind. App. 102, 310 N.E.2d 101 wherein doubt was expressed as to the propriety of a summary judgment in a Totten trust case involving depositor's intent.)

Furthermore, as we hereinbefore noted in Part I, Robison's opposition to the summary judgment in the form of answer

and affidavits pointed to no act or fact demonstrating existence of a genuine issue as to whether Lucy's meaning was other than that expressed objectively by her contracts. Indiana Rules of Procedure, Trial Rule 56(E) provides in part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

By reason of the holdings hereinbefore set forth and in light of earlier "state of mind" summary judgments heretofore affirmed, in the face of not dissimilar contentions (*Wagoner* v. *Wagoner* (1970), 147 Ind. App. 696, 263 N.E.2d 657; *In re Estate of Ensminger* (1969), 144 Ind. App. 338, 246 N.E.2d 217), when read in the light of TR. 56(E), *supra,* we affirm the summary judgment entered below.

Buchanan, P.J., concurs; White, J., concurs in result.

NOTE.—Reported at 340 N.E.2d 824.